# In the United States Court of Federal Claims

No. 18-84C
(Filed Under Seal: March 29, 2018)
(Reissued for Publication: April 17, 2018)[*]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| AMERICAN CORRECTIONAL HEALTHCARE, INC.,       \* | |
|       \* | |
|     Plaintiff,       \* | |
|       \* | |
| v.       \* | Postaward Bid Protest; Cross-Motions for |
|       \* | Judgment on the Administrative Record; |
| THE UNITED STATES,       \* | Scope of Evaluation of Technical Proposals; |
|       \* | Meaningful and Equal Discussions; Best |
|     Defendant,       \* | Value Determination; Tradeoff Analysis; |
|       \* | Permanent Injunction; Waiver |
| and       \* | |
|       \* | |
| NAPHCARE, INC.,       \* | |
|       \* | |
|     Defendant-Intervenor.       \* | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

<u>H. Todd Whay</u>, McLean, VA, for plaintiff.

<u>Devin A. Wolak</u>, United States Department of Justice, Washington, DC, for defendant.

<u>Jason A. Carey</u>, Washington, DC, for defendant-intervenor.

## OPINION AND ORDER

**SWEENEY**, Judge

      In this postaward bid protest, plaintiff American Correctional Healthcare, Inc. ("ACH") contends that the Federal Bureau of Prisons ("BOP") erred in awarding a comprehensive medical services contract to defendant-intervenor NaphCare, Inc. ("NaphCare"). Specifically, ACH alleges that the BOP improperly evaluated the offerors' proposals, failed to conduct meaningful discussions, and erred in determining which proposal represented the best value. Before the

---

      [*] This reissued Opinion and Order incorporates the agreed-to redactions proposed by the parties on April 16, 2018, with minor changes for consistency. The redactions are indicated with bracketed ellipses ("[. . .]")

court are the parties' cross-motions for judgment on the administrative record.  As explained below, the court grants in part and denies in part all three motions, and enters a permanent injunction enjoining the BOP from commencing performance of its contract with NaphCare until it reopens discussions, reevaluates the proposals, and makes a new source selection determination.

## I.  BACKGROUND

### A.  The Solicitation

Normally, "the BOP provides essential medical, dental, and mental health services to Federal inmates" using its own resources.  Administrative R. ("AR") 22.  However, when the BOP is unable to provide for a particular medical need, it relies on a contractor to provide the necessary services.  Id.  The contract to provide these services for the United States Penitentiary in Atlanta, Georgia ("USP Atlanta")–held by ACH–was set to expire on January 31, 2017.  Id. at 137.  Thus, the BOP sought to award a new contract.

On September 12, 2016, the BOP issued solicitation RFPP03011600001 to acquire comprehensive medical services for USP Atlanta.  Id. at 15.  The BOP intended to award a single "indefinite delivery/requirements type contract with firm fixed unit prices" with an initial one-year term and four one-year option periods.  Id. at 53.  The solicitation incorporated section 52.212-4 of the Federal Acquisition Regulation ("FAR"), id. at 15, which provides:

> The Contractor shall only tender for acceptance those items that conform to the requirements of this contract.  The Government reserves the right to inspect or test any supplies or services that have been tendered for acceptance.  The Government may require repair or replacement of nonconforming supplies or reperformance of nonconforming services at no increase in contract price.  If repair/replacement or reperformance will not correct the defects or is not possible, the Government may seek an equitable price reduction or adequate consideration for acceptance of nonconforming supplies or services.

FAR 52.212-4(a) (2016).

The "necessary services" that the BOP sought to procure were described in the solicitation's Performance Work Statement "in terms of output rather than specific task assignments."  AR 23.  Of the five listed outputs, two are relevant here:

> Output #1:  Provide inpatient and outpatient facility services which conform to community standards and all local, state and Federal laws and regulations applicable to the delivery of health care to members of the general public.  . . .

Output #2:  Provide professional services which conform to community standards and all local, state and Federal laws and regulations applicable to the delivery of health care to members of the general public.

Id.  With respect to Output #1, the contractor would be required to

provide facility services on an as-needed basis in a manner which adheres to community standards of quality and cost-effective medical care.  The services required to satisfy Output #1 may include inpatient facility and outpatient facility, including emergency room services.  Inpatient visits for non-emergency services shall require private room accommodations with available space for up to three armed or unarmed guards per inmate.

Id. at 24.  With respect to Output #2, the contractor would be required to provide "[p]rofessional services . . . in a community-based setting (e.g., hospital facility, surgical center, physician's office, etc.)" or "within the confines of the USP."  Id. at 25.

The BOP instructed offerors to submit proposals in three volumes:  a volume containing a technical proposal, a volume containing past performance information, and a volume containing a business proposal.  Id. at 47.  Relevant here are the technical and business proposals.  The technical proposal was to "contain enough specificity to address each evaluation factor and the terms and conditions of the Performance Work Statement."  Id. at 60.  Offerors were also required to include in their technical proposals a Technical Proposal Summary Sheet for each hospital network that the offeror proposed using for inpatient and outpatient facility services; each Technical Proposal Summary Sheet was to indicate what services the hospital network offered and whether the offeror was excluding from its proposal any of the services offered by the hospital network.  Id. at 60, 107-09.  Additionally, offerors were "encouraged to propose enhancements to the basic contract requirements" that would "facilitate the USP's ability to conform to the BOP's stated mission."  Id. at 30.  Proposal enhancements that would "assist the USP in mitigating security concerns" were particularly encouraged.  Id.; see also id. (explaining that there are "security concerns inherent in transporting" inmates to receive medical care and therefore USP Atlanta's preference was to "treat inmates within the confines of a secure perimeter whenever possible").

The business proposal was to include a completed Schedule of Items indicating proposed prices for each of six categories:  Inpatient Facility Services, Outpatient Facility Services, Inpatient/Outpatient Physician Services, Outpatient Institution Services (Optometrist), Outpatient Institution Services (Oral Surgeon), and Outpatient Institution Services (Other Physicians).  Id. at 19-22, 62.  With respect to four of the categories (the first three and the sixth), the BOP explained that

offerors will be allowed to propose a variance from the benchmark Medicare rate in the form of a discount from or a premium to Medicare rates established by the

Centers for Medicare and Medicaid Services. . . . [O]fferors need only to propose that percentage discount from or premium to the Medicare benchmark rate which will reflect the desired level of payment for the category of services rendered.

Id. at 17; accord id. at 19-22 (containing the Schedule of Items).  For the other two categories, offerors were to propose per-session dollar amounts.  Id. at 19-22.

The BOP advised offerors that its technical evaluation would "be based on the documentation which supports an offeror's ability to perform in accordance with the terms and conditions of [the] solicitation."  Id. at 63.  Specifically, the BOP would determine whether a proposal included a

[d]emonstrated approach to providing an appropriate mix of resources to deliver quality medical care to the inmates of the USP, while mitigating the Government's cost and security risks, as measured by the following subfactors, which are of equal importance:

1.  Level of diversity of services proposed;

2.  Driving distance and conditions to and from the community-based providers;

3.  Accreditation status of the proposed contract facility (s);

4.  Enhancements to the basic contract requirements proposed by the offeror which will facilitate the USP's ability to conform to the BOP's stated mission.

Id. at 64.

The BOP also advised offerors that it would evaluate their proposed prices

to determine which proposal offer[ed] the lowest price to the Government.  The offeror providing the highest discount from the Medicare rate will be considered to be offering the lowest price in each category.  The offeror proposing the highest premium to the Medicare rate will be considered to be offering the highest price in each category.  For other items, [the] offeror proposing the lowest unit price will be considered to be offering the lowest price in each category.

Id. at 63; see also id. at 17 ("Except for services based on session rates, price proposals [sic] will be calculated from benchmarks utilizing Medicare reimbursement methodologies.").  It indicated that the pricing categories were not of equal importance, listing them from most important to least important as follows:  Inpatient Facility Services, Inpatient/Outpatient Physician Services, Outpatient Institution Services (Other Physicians), Outpatient Facility Services, Outpatient Institution Services (Optometrist), Outpatient Institution Services (Oral Surgeon).  Id. at 64.  The

BOP provided that once it determined which offeror proposed the lowest price in a particular category, it would assign "a proportionate amount of points . . . to each offeror below the highest-ranked offeror in each category."[1]  Id.

Overall, the BOP planned to award the contract to the responsible offeror "whose proposal, conforming to the solicitation, [was] determined to be in the best interest of the Government, price and other factors considered."  Id.  It explained that "[i]n this tradeoff process, non-price factors (when combined) [were] approximately equal to price" and that "[t]echnical criteria and past performance [were] of equal value."  Id.  Further, the BOP advised that "should the offerors' proposals be considered approximately the same or equal under non-price factors, price could be paramount in the selection decision."  Id.

## B.  The Proposals

The BOP received seven proposals from six offerors by the October 28, 2016 deadline set forth in the solicitation,[2] id. at 798, including proposals from ACH and NaphCare, id. at 152-472.

In its technical proposal, ACH, a service-disabled, veteran-owned small business, id. at 155, offered to provide inpatient and outpatient facility services at [. . .], id. at 161.  ACH designated [. . .] as its primary and trauma provider, [. . .] as its secondary provider, [. . .] as its overflow provider, and [. . .] as its long-term care provider.  Id. at 158.  Notably, in the exclusion section of the Technical Proposal Summary Sheets for [. . .], ACH indicated that the hospital networks would "not be providing behavioral health services of any kind."  Id. at 315, 323; see also id. at 176-86 (reflecting that [. . .] did not offer behavioral health services).  With respect to inpatient and outpatient physician services, ACH stated that its network included physicians (including psychiatrists) associated with [. . .].  Id. at 203-301.  Further, ACH identified the physicians (including a psychiatrist with privileges at [. . .]) and [. . .] providers it would use to

---

[1]  Thus, by implication, offerors were advised that for each of the six pricing categories, the BOP would assign the most points to the offeror with the lowest proposed price, and proportionately fewer points to each offeror with a higher proposed price.  Indeed, in its Source Selection Plan, the BOP provided:

> The maximum number of points available in each pricing category will be allotted to the offeror proposing the lowest price.  Each higher price thereafter will be awarded a proportionate number of points according to the following procedure: [. . .]

AR 11.

[2]  Offerors were "encouraged" to submit multiple proposals.  AR 59.  NaphCare submitted two proposals, see id. at 381-472, only the second of which is relevant in this bid protest.

supply outpatient institution services.  Id. at 302.  Finally, ACH offered several enhancements:
[. . .]  Id. at 311-12.

   In its technical proposal, NaphCare stated that it would provide inpatient and outpatient
facility services at [. . .].  Id. at 384, 389.  NaphCare designated [. . .] as its primary provider,
[. . .] as its alternate providers, and [. . .].  Id.  Notably, in the exclusion section of its Technical
Proposal Summary Sheets for all four hospital networks, NaphCare indicated that it was not
excluding any services they offered.  Id. at 428, 431, 434, 437.  With respect to inpatient and
outpatient physician services, NaphCare stated that its network included physicians associated
with [. . .].  Id. at 400-02.  Further, NaphCare represented that it had agreements with physicians
and providers affiliated with [. . .] to supply outpatient institution services.  Id. at 302.  Finally,
NaphCare offered several enhancements, including:  [. . .]  Id. at 411-15.

   In their business proposals, ACH and NaphCare offered the following prices:[3]

| Category | ACH | NaphCare |
| --- | --- | --- |
| Inpatient Facility Services | [. . .] | [. . .] |
| Outpatient Facility Services | [. . .] | [. . .] |
| Inpatient/Outpatient Physician Services | [. . .] | [. . .] |
| Outpatient Institution Services (Other Physicians) | [. . .] | [. . .] |
| Outpatient Institution Services (Optometrist) | [. . .] | [. . .] |
| Outpatient Institution Services (Oral Surgeon) | [. . .] | [. . .] |

Id. at 372-74, 458-61.  ACH did not indicate how it would price services offered by its proposed
long-term care provider.  See id. at 327 (noting only that [. . .] would "operate as the long term
acute care provider").  NaphCare indicated that the services performed at [. . .] would
be paid under the outpatient facility services and inpatient/outpatient physician services rates.  Id.
at 438, 458-61.

---

[3] For the price categories in which offerors were to propose discounts or premiums to
Medicare rates, [. . .].

### C. Initial Evaluation of Proposals

The contracting officer/source selection authority ("SSA"), id. at 12, forwarded the proposals to the chair of the technical evaluation panel on November 2, 2016, and requested that the panel return its evaluation forms "within a few weeks," id. at 126-29.  Because the panel did not do so, the SSA evaluated the proposals himself and, on February 6, 2017, forwarded his assessments to the panel for their concurrence.[4]  Id. at 141.  The panel never sent the SSA the requested concurrence.  Id. at 473.  Thus, on March 1, 2017, the SSA deemed his ratings to be the official ratings of the proposals.  Id.

When he evaluated the technical proposals, the SSA assigned each proposal a color/adjectival rating.  See, e.g., id. at 473-80.  The possible ratings, as set forth in the Source Selection Plan, were Blue/Exceptional, Purple/Very Good, Green/Satisfactory, Yellow/Marginal, and Red/Unsatisfactory.  Id. at 9.  The Green/Satisfactory rating was defined as:

[. . .]

Id.  In addition, "[i]f a proposal [did] not fully comply with all of the criteria for a rating category," the SSA was permitted, but not required, to "assign a rating and append either a plus sign (+) or a minus sign (-) to indicate an intermediate rating."  Id.

In his evaluation of ACH's technical proposal, the SSA began by commenting on the diversity of services that ACH offered.  Id. at 474.  He described the facilities at which ACH was offering services, noted that ACH excluded the behavioral health services offered at [. . .], and confirmed that ACH included "all requested on-site institution services . . . ."  Id.  He therefore concluded:  [. . .]  Id. at 474-75.  Next, the SSA described [. . .] the enhancements offered by ACH:  [. . .]  Id. at 475.  The SSA then noted [. . .] strengths for ACH's proposal [. . .] and zero weaknesses.  Id.  Overall, the SSA rated ACH's technical proposal as Green/Satisfactory, commenting:

[. . .]

Id. at 475-76.

In his evaluation of NaphCare's technical proposal, the SSA began by commenting on the diversity of services that NaphCare offered.  Id. at 477.  He described the facilities at which

---

[4]  The individual who evaluated the proposals was not the individual who forwarded the proposals to the chair of the technical evaluation panel.  Compare AR 127-28 (indicating that Dennis A. Chinnici forwarded the proposals to the technical evaluation panel), with id. at 141 (indicating that Darren Doggett evaluated the proposals).  Although there is no documentation of the change in SSAs in the administrative record, it appears that Mr. Doggett replaced Mr. Chinnici as SSA between November 2, 2016, and February 6, 2017.

NaphCare was offering services, noted that NaphCare did not exclude any services offered at the facilities, and confirmed that NaphCare included "all requested on-site services." Id. He therefore concluded:  [. . .] Id. at 478.  Next, the SSA described [. . .] the enhancements offered by NaphCare:  [. . .] Id. The SSA then noted [. . .] strengths for NaphCare's proposal [. . .] and zero weaknesses.  Id.  Overall, the SSA rated NaphCare's technical proposal as Green/Satisfactory(+), commenting:

> [. . .]

Id. at 478-79.

The SSA next evaluated the offerors' past performance, assigning ratings of Very Good to both ACH and NaphCare.  Id. at 480.  Finally, the SSA evaluated the prices proposed by the offerors in their business proposals.  Id. at 481-97.  First, for the price categories pegged to Medicare rates, he converted those percentages to a score, as follows:

> [. . .]

Id. at 482.  Using the resulting scores (and the per-session dollar amounts for the two price categories not pegged to Medicare rates), the SSA determined which offerors proposed the lowest price in each category.  Id. at 486-97.  He then used the following methodology to determine each offerors' total pricing score:[5]

> In order to apply the solicitation criteria for evaluation of price, it is necessary to score the price proposals by giving the lowest price in each category the maximum number of points.  Each higher-priced proposal is then awarded a proportionate number of points according to the following procedure:  [. . .]
>
> Inpatient Facility Services [. . .]
>
> In/Out Physician Services [. . .]
>
> Outpatient Institution Services (Other Physicians) [. . .]
>
> Outpatient Facility Services [. . .]
>
> Outpatient Institution Services (Optometrist) [. . .]
>
> Outpatient Institution Services (Oral Surgeon) [. . .]

---

[5] For simplicity, the court omits the SSA's description of how he scored the prices for the authorized six-month extension of services.  See AR 485.

Id. at 485.  Under this methodology, a higher total pricing score reflects a lower total proposed price.  Id.  ACH's total pricing score was 96.30, and NaphCare's total pricing score was 93.18. Id. at 480, 487, 491.

### D.  Discussions and Final Proposal Revisions

After he evaluated all of the proposals, the SSA determined that discussions should be conducted.  Id. at 498.  He established a competitive range consisting of ACH's and NaphCare's proposals, id. at 498-99, and determined the topics for discussions, id. at 500.  On March 6, 2017, the SSA sent ACH and NaphCare letters to initiate discussions.  Id. at 501-04.  He requested the following information from ACH:  "Reference:  Technical Proposal.  ACH has excluded Behavioral Health as an offered specialty at [. . .].  Please provide an explanation for the exclusion and confirm that this specialty is available at [. . .]."  Id. at 501.  He requested the following information from NaphCare:

Reference:  Technical Proposal.  Please provide additional information regarding [. . .].

Reference:  Business Proposal.  The proposed price in the following categories is considered a weakness:

[. . .]

Id. at 503.  The SSA instructed both offerors to submit final proposal revisions by March 22, 2017, that addressed the issue or issues he raised.  Id. at 501, 503.  He also noted that "this [was the offerors'] opportunity to make any final revisions in the proposal[s they might] deem necessary," and explained that the offerors could make changes to their proposals beyond the issue or issues he identified.  Id.

With its final proposal revision, ACH provided the following response to the discussion issue raised by the SSA:

Both [. . .] behavioral wings are "open" units.  There are significant security risks associated with allowing Federal inmates [to] utilize open psychiatric units within each hospital.  These risks have been discussed with both the prison and the hospitals during the previous contract term, and the hospitals will not accept the inmates as patients.  Regarding [. . .], this provider does not offer behavioral services or psychiatric care at this time.

ACH is now offering [. . .] as an additional provider for medical services, including behavioral health.

Id. at 506.  Then, in its final proposal revision, ACH indicated that [. . .].  With respect to behavioral health services, ACH represented:

> Behavioral Health Services at [. . .] offers crisis intervention and crisis stabilization services for adults of all ages for mental illness (including chemical dependency and detoxification) that meets a level of acuity requiring inpatient care. [Its] clinical staff provides assessments and appropriate dispositions 24 hours a day, seven days a week for patients in the Emergency Department or on medical units within the hospital.  [. . .]'s Behavioral Health Services <u>locked inpatient unit</u> also considers transfers from other facilities on a case-by-case basis for most mental illnesses if criteria are met for an inpatient level of care.  This unit will be the primary psychiatric inpatient unit for USP Atlanta's psychiatric needs.
>
> Behavioral Health Services at [. . .] does not currently offer any outpatient assessment or treatment services[.]

Id. at 552.  ACH did not change its proposed prices in its final proposal revision.  Id. at 506.

In its final proposal revision, NaphCare provided the information requested by the SSA regarding [. . .]:

[. . .]

Id. at 751.  In addition, NaphCare revised its proposed prices as follows:

| Category | NaphCare (Old) | NaphCare (New) |
|---|---|---|
| Inpatient Facility Services | [. . .] | [. . .] |
| Outpatient Facility Services | [. . .] | [. . .] |
| Inpatient/Outpatient Physician Services | [. . .] | [. . .] |
| Outpatient Institution Services (Other Physicians) | [. . .] | [. . .] |
| Outpatient Institution Services (Optometrist) | [. . .] | [. . .] |
| Outpatient Institution Services (Oral Surgeon) | [. . .] | [. . .] |

Id. at 454-57, 503, 773-76.

The SSA evaluated the final proposal revisions in May 2017.  Id. at 777-82.  In his evaluation of ACH's technical proposal, the SSA noted the addition of [. . .], but otherwise did not change his initial evaluation.  Compare id. at 474-76 (initial evaluation), with id. at 777-79 (new evaluation).  The SSA did not make any changes to his evaluation of NaphCare's technical proposal.  Compare id. at 477-79 (initial evaluation), with id. at 780-82 (new evaluation).  With respect to the offerors' proposed prices, the SSA calculated ACH's total pricing score as 109.83 and NaphCare's total pricing score as 106.15.  Id. at 789, 791-92.

## E.  The Source Selection Decision and Contract Award

On June 5, 2017, the SSA prepared two documents:  a Price Analysis and a Summary of Negotiations.  Id. at 793-97.  In the Price Analysis, the SSA sought to determine whether the prices proposed by NaphCare were fair and reasonable, as required by FAR 15.404-1(b).  Id. at 793-95.  His analysis involved comparing NaphCare's proposed prices to both the prices proposed by ACH and the prices proposed by the offerors whose proposals were excluded from the competitive range.[6]  Id. at 793.  Upon making the comparisons, the SSA concluded that all of NaphCare's proposed prices were fair and reasonable.  Id. at 793-95.  In the Summary of Negotiations, the SSA summarized his discussions with NaphCare.[7]  Id. at 796-97.  [. . .]  Id.

Then, on August 14, 2017, the SSA issued his Source Selection Decision.  After explaining that only two proposals remained in the competition and that the offerors who submitted those proposals–ACH and NaphCare–were assigned the same Past Performance rating, id. at 798-99, the SSA compared ACH's and Naphcare's technical proposals:

> Each offeror included the same additional hospitals with exception of [. . .] which is offered by ACH.  Each offeror included a [. . .] in the network of offered hospitals.  [. . .]  Each offeror is proposing a good diversity of physician services at [. . .].  Also, each offeror includes all requested institution-based physician services.  [. . .]

> ACH includes several Long Term Care (LTC) facilities in their network.  However, LTC facilities are covered by a different Medicare reimbursement fee schedule which was not included in the solicitation.  There is no pricing mechanism in the solicitation which would allow a proper evaluation of this offering.  The proposal is unclear regarding the cost for services provided at an LTC facility.  Therefore, the Government could not determine the value of the LTC facilities based on the information submitted by ACH.

---

[6]  There is no indication in the administrative record that the SSA performed a similar analysis of ACH's prices.

[7]  There is no indication in the administrative record that the SSA prepared a similar document summarizing his discussions with ACH.

ACH excluded behavioral health as a hospital and physician specialty at [. . .].  Naphcare did not exclude any hospital or physician specialty at any of their proposed hospitals.  ACH's exclusion of behavioral health at [. . .] creates a less comprehensive and diverse approach.  Naphcare's offering of mental health at [. . .] three proposed hospitals is considered beneficial to the USP.  The solicitation notified offerors that the Government would evaluate diversity of services.  By specifically excluding behavioral health [. . .], ACH weakened their technical approach for meeting the medical needs of the USP.  ACH was informed of this weakness during discussions; however, ACH made no changes in [its] Final Proposal Revision in this area.  . . .  Thus, Naphcare is offering the USP a larger group of medical providers to service the inmate population.  Therefore, for the diversity of services offered evaluation factor, Naphcare's proposal is more advantageous than ACH.

[. . .]

. . . .

Each proposal included enhancements to the basic contract requirement.  [. . .]

. . . .

[. . .]

Conversely, the enhancements proposed by ACH offer fewer benefits than Naphcare.  [. . .]  Accordingly, the enhancements proposed by Naphcare offer more benefits to the overall day-to-day medical operation at USP Atlanta than those proposed by ACH.

Therefore, Naphcare has a clear advantage over ACH in the areas of diversity of services and proposed enhancements.  When considering the offerings contained within each technical proposal, Naphcare's technical proposal is more valuable to the USP than the offerings in technical proposal of ACH.

Id. at 799-801.  Next, with respect to the offerors' proposed prices, the SSA observed:

ACH received a higher score in the price evaluation than Naphcare by 3.68 points.  [. . .]  Therefore, ACH has a slight advantage over Naphcare by offering the lowest overall price.

Id. at 801.

-12-

Then, because the highest-rated proposal was not the lowest-priced proposal, the SSA performed a tradeoff analysis:

> Although ACH received a <u>Satisfactory</u> rating and Naphcare received a <u>Satisfactory(+)</u> rating in the technical evaluation, there were discernable differences included in the proposals.  When analyzing each proposal, the differences between the two proposals are evident in the diversity of services offered and proposed enhancements.  Naphcare offers medical services at [. . .].  Naphcare does not exclude any medical specialty offered at these facilities.  ACH offers medical services at [. . .] and specifically excludes behavioral health at [. . .].  Therefore, the diversity of services offered by Naphcare delivers more assurances that the majority of essential medical services are covered when compared to the diversity of services offered by ACH.  Also, Naphcare's enhancements offer greater administrative support when compared to the enhancements of ACH.

> . . . As detailed above, Naphcare's proposal offers the Government the best value by offering a technical approach which includes a larger diversity of medical services and better enhancements.  While Naphcare's proposed prices are slightly higher than ACH['s], I find the technical benefits of a proposal which does not exclude any medical specialty, offers [. . .], and includes value-added enhancements merits the payment of a slight price premium and therefore represents the best value.

<u>Id.</u> at 801-02.  Accordingly, the SSA concluded that the contract should be awarded to NaphCare. <u>Id.</u> at 802.

### F. ACH's Government Accountability Office Protests

The BOP notified the offerors of the contract award to NaphCare on August 15, 2017, <u>id.</u> at 803, 812, and provided ACH with a written debriefing the following day, <u>id.</u> at 814-15.  Five days later, on August 21, 2017, ACH lodged a protest with the Government Accountability Office ("GAO").  <u>Id.</u> at 816.  In support of its protest, ACH submitted copies of several electronic-mail messages from July 2014 and February 2015 indicating that on two separate occasions, ACH was unable to find a facility in Atlanta or the Atlanta area willing to accept an inmate requiring inpatient psychiatric care because the psychiatric units at those facilities were "open type units."  <u>Id.</u> at 830-31.  ACH then submitted a supplemental protest on August 28, 2017, <u>id.</u> at 836, attached to which was a declaration made under penalty of perjury by Winston E. Dixon, ACH's president, <u>id.</u> at 843-44.  In his declaration, Mr. Dixon averred:

> 11. . . . On August 22nd and 23rd of 2017, I confirmed through my contacts at [. . .] that Naphcare has agreements with [. . .].  Naphcare does not have any agreements to provide services with [. . .].

12.  Inpatient mental health services (in the open unit) for inmates are not available at [. . .].

13.  Based upon the actual usage of healthcare under ACH's incumbent contract, I calculated the price difference between the ACH and Naphcare offers. . . .  The pricing offered by ACH is approximately $1,115,940.65 less than the pricing proposed by Naphcare over the 5-year period of performance[.]

Id.; see also id. at 5 ([. . .]).  On September 1, 2017, after the BOP advised "that it would take corrective action by conducting a reevaluation of the proposals and making a new best value award determination," the GAO dismissed ACH's protests as academic.  Id. at 847.

On September 21, 2017, the SSA reevaluated the offerors' final proposal revisions.  Id. at 848-53.  In reevaluating ACH's technical proposal, the SSA provided a more detailed description of [. . .], indicating that [. . .].  Id. at 848-49; accord id. at 850.  The SSA also [. . .] the following comment [. . .] long-term care facility [. . .]:  "Reimbursement Rate is unknown."  Id. at 850.  Finally, the SSA noted the following as a weakness:  "Exclusion of behavioral health at [. . .].  Inpatient behavioral health only offered at one hospital and specifically excludes outpatient behavioral health."  Id.  The SSA did not make any other substantive changes to his earlier evaluation of ACH's technical proposal.  Compare id. at 777-79 (earlier evaluation), with id. at 848-50 (new evaluation).

In reevaluating NaphCare's technical proposal, the SSA made only two changes to his earlier evaluation.  Compare id. at 780-82 (earlier evaluation), with id. at 851-53 (new evaluation).  First, he added a [. . .] item to the list of enhancements:  [. . .]  Id. at 852.  Second, he [. . .] strengths:  [. . .]  Id.

After his reevaluation, the SSA summarized his ratings of each proposal, which remained unchanged for his prior evaluation:

| Offeror | Technical Rating | Past Performance Rating | Price Score |
|---------|------------------|-------------------------|-------------|
| ACH | Satisfactory | Very Good | 109.83 |
| NaphCare | Satisfactory(+) | Very Good | 106.15 |

Id. at 855.  The SSA then prepared a new Source Selection Decision by revising his original Source Selection Decision to incorporate his findings from his reevaluation of the final proposal revisions.  Compare id. at 798-802 (original Source Selection Decision), with id. at 856-61 (new Source Selection Decision).  In comparing the offerors' technical proposals, the SSA amended his original Source Selection Decision by addressing [. . .] and including the following comments regarding ACH's provision of behavioral health services:

> ACH did add [. . .] to the network of hospitals without excluding any medical
> specialty.  However, ACH is offering inpatient behavioral health only at [. . .].
> ACH stated that outpatient assessment and treatment is not available at [. . .].
> Therefore, if ACH were awarded the contract, the offering of behavioral health
> would be confined to one hospital and only if the inmate required treatment at an
> inpatient facility.

Id. at 858.  Additionally, the SSA noted in his tradeoff analysis that ACH offered inpatient
behavioral health services at only one hospital.  Id. at 860.  In all other respects, the new Source
Selection Decision was substantially the same as the original Source Selection Decision.
Compare id. at 798-802 (original Source Selection Decision), with id. at 856-61 (new Source
Selection Decision).

Accordingly, the BOP notified the offerors on September 22, 2017, that the award to
NaphCare had been affirmed.  Id. at 862, 864.  It subsequently provided ACH with a written
debriefing on September 26, 2017.  Id. at 865-66.

ACH lodged another protest with the GAO on September 29, 2017, id. at 867, attaching
the same electronic-mail messages and declaration it attached to its earlier protest, id. at 882-83,
894-95.  ACH then submitted a supplemental protest on October 6, 2017, id. at 898, to which it
attached a new declaration–again made under the penalty of perjury–from Mr. Dixon, id. at 906.
In this second declaration, Mr. Dixon averred:

> 11.  During the past six years of performance of the incumbent contract, the
> Agency has never requested outpatient clinical behavioral services.

> 12.  I have spoken with . . . the Managed Care Director at [. . .].  She confirmed
> that [. . .] has not been willing to accept inmates into their Behavioral Health
> "Open Wings," and she is unaware of any change to the hospital[']s policy
> regarding inmates.

> 13.  I have communicated with . . . the Executive Director of [. . .].  He confirmed
> with hospital administration that the hospital does not provide inpatient behavioral
> health services to USP Atlanta inmates due to security concerns.

Id.  Ultimately, the GAO dismissed some of ACH's protest grounds and, on January 2, 2018,
denied the remainder of the protests.  Id. at 978-84.

## G.  ACH's Protest in This Court

On January 17, 2018, ACH filed the instant protest pursuant to 28 U.S.C. § 1491(b).  In
its complaint, ACH alleges that the BOP unreasonably evaluated the proposals with respect to
behavioral health services and the overall diversity of services; that the BOP's best value

determination was unreasonable due to a misapplication of factor weights, the lack of any meaningful consideration of price, and a failure to consider material facts regarding the availability of behavioral health services for inmates; and that the BOP did not engage it in meaningful discussions.  ACH therefore requests a declaration that the BOP's evaluation of proposals was arbitrary, capricious, an abuse of discretion, and contrary to law; an order requiring the agency to conduct discussions, reevaluate proposals, and make a new best value determination; a permanent injunction prohibiting the BOP from procuring any work under the contract awarded to NaphCare until a new best value determination is made; and an award of its fees, costs, interest, and expenses.

Pursuant to a schedule proposed by the parties, briefing on cross-motions for judgment on the administrative record concluded on February 27, 2018, and the court heard argument on March 20, 2018.[8]  In addition, the day before oral argument, NaphCare filed a motion to strike two small portions of the administrative record (twelve pages total), which defendant addressed during oral argument and ACH opposed in a written response filed after oral argument. Thereafter, at the court's direction, ACH filed a declaration from Mr. Dixon–made under the penalty of perjury–in support of its request for a permanent injunction, to which defendant and NaphCare responded.[9]  The court is now prepared to rule.

## II.  DISCUSSION

In ruling on motions for judgment on the administrative record pursuant to Rule 52.1(c) of the Rules of the United States Court of Federal Claims ("RCFC"), "the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record."  A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006)

---

[8]  When proposing this schedule, the parties advised the court that the BOP had agreed to stay performance of the contract awarded to NaphCare until the court resolved ACH's protest or April 1, 2018, whichever was earlier.  Subsequently, on March 29, 2018, defendant filed a notice indicating that on March 21, 2018, the BOP extended ACH's contract through the end of April 2018.  Defendant explained that the BOP did not inform BOP counsel or counsel from the United States Department of Justice of the contract extension until March 29, 2018.  The court appreciates defense counsel's candor, and has no reason to believe that defense counsel knew that the BOP extended ACH's contract but withheld that information from the court; indeed, defense counsel has acted with honesty and integrity throughout all of his appearances before the court.  Further, the court notes that neither the notice, nor the actions described in the notice, affected its ruling in this matter.

[9]  The court directed ACH to file a declaration in support of its request for a permanent injunction in a March 22, 2018 order.  Because ACH filed the declaration at the court's direction, defendant's and NaphCare's contentions–advanced in their responses to the declaration–that ACH did not request leave of court to file the declaration and failed to argue or prove excusable neglect in conjunction with its admittedly late submission are not well taken.

(citing Bannum, Inc. v. United States, 404 F.3d 1346, 1356 (Fed. Cir. 2005)).  Because the court makes "factual findings . . . from the record evidence," judgment on the administrative record "is properly understood as intending to provide for an expedited trial on the administrative record." Bannum, 404 F.3d at 1356.

In its motion for judgment on the administrative record, ACH contends that the BOP's award of the contract to NaphCare was arbitrary, capricious, an abuse of discretion, and contrary to law because the BOP did not properly evaluate the proposals, did not conduct meaningful and equal discussions, and rendered a flawed best value determination.  In their cross-motions for judgment on the administrative record, defendant and NaphCare assert that the BOP properly conducted the procurement.

## A.  Legal Standard

The court reviews challenged agency actions pursuant to the standards set forth in 5 U.S.C. § 706.  28 U.S.C. § 1491(b)(4) (2012).  Specifically, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A):  a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1350 (Fed. Cir. 2004). Under this standard, the court

> may set aside a procurement action if "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure."  A court reviews a challenge brought on the first ground "to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis."  "When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations."

Centech Grp., Inc. v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (citations omitted) (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332-33 (Fed. Cir. 2001)); accord Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) ("The arbitrary and capricious standard . . . requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors.").

Procurement officials "are 'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process."  Impresa, 238 F.3d at 1332 (quoting Latecoere Int'l, Inc. v. U.S. Dep't of the Navy, 19 F.3d 1342, 1356 (11th Cir. 1994)).  Thus, the court's review of a procuring agency's decision is "highly deferential."  Advanced Data Concepts, 216 F.3d at 1058; see also Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971) ("The court is not empowered to substitute its judgment for that of the agency.").  Furthermore, a "protestor's burden of proving that the award was arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law is greater [in negotiated procurements] than in other types of bid protests." Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004). And, when a contract is to be awarded on a "best value" basis, procurement officials have "even greater discretion than if the contract were to have been awarded on the basis of cost alone." Id. (citing E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996) ("Procurement officials have substantial discretion to determine which proposal represents the best value for the government.")).

In addition to showing "a significant error in the procurement process," a protestor must show "that the error prejudiced it." Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996); see also Bannum, 404 F.3d at 1351 (holding that if the procuring agency's decision lacked a rational basis or was made in violation of the applicable statutes, regulations, or procedures, the court must then "determine, as a factual matter, if the bid protester was prejudiced by that conduct"). "To establish prejudice . . . , a protester must show that there was a 'substantial chance' it would have received the contract award absent the alleged error." Banknote, 365 F.3d at 1350 (quoting Emery Worldwide Airlines, Inc. v. United States, 264 F.3d 1071, 1086 (Fed. Cir. 2001)); see also Data Gen., 78 F.3d at 1562 ("[T]o establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract."). The test for establishing prejudice "is more lenient than showing actual causation, that is, showing that but for the errors [the protestor] would have won the contract." Bannum, 404 F.3d at 1358.

## B. The BOP's Evaluation of Technical Proposals

ACH first argues that the BOP failed to consider information regarding the availability of, and need for, behavioral health services for USP Atlanta's inmates when it evaluated the offerors' technical proposals. Defendant and NaphCare generally respond that the BOP properly confined its evaluation to the information requested in the solicitation and contained in the proposals.

### 1. Consideration of Information Regarding the Availability of Behavioral Health Services

ACH initially contends that the BOP failed to consider, when evaluating the proposals, important information regarding the availability of behavioral health services for federal inmates at the facilities proposed by the offerors. As noted above, NaphCare did not exclude behavioral health services from any of the facilities identified in its initial proposal, including [. . .]. In contrast, in its initial proposal, ACH excluded the behavioral health services offered by [. . .], and suggested that [. . .] did not offer behavioral health services at all. During discussions, the BOP asked ACH to explain the reason for the exclusions and to confirm that [. . .] did not offer behavioral health services. With its final proposal revision, ACH provided the following response:

> Both [. . .] behavioral wings are "open" units.  There are significant security risks associated with allowing Federal inmates [to] utilize open psychiatric units within each hospital.  These risks have been discussed with both the prison and the hospitals during the previous contract term, and the hospitals will not accept the inmates as patients.  Regarding [. . .], this provider does not offer behavioral services or psychiatric care at this time.

AR 506.  Additionally, in its final proposal revision, ACH added [. . .] as an available provider and indicated that [. . .] offered inpatient behavioral health services.

Notwithstanding ACH's representations that [. . .] did not accept federal inmates in their behavioral health units and [. . .] did not offer behavioral health services at all, the BOP did not reopen discussions to ascertain whether NaphCare could provide behavioral health services using [. . .].  Rather, the BOP evaluated the final proposal revisions and then, in its Source Selection Decision, considered ACH's exclusion of the behavioral health services at [. . .] as diminishing the diversity of services offered by ACH, while simultaneously praising NaphCare's inclusion of behavioral health services at these same facilities.  Moreover, when it took corrective action in response to ACH's initial GAO protest, the BOP did not reopen discussions regarding the availability of behavioral health services at the facilities included in the offerors' proposals even though it had received, during the protest, a declaration from Mr. Dixon in which Mr. Dixon reasserted that [. . .]–facilities with which ACH had contracts to provide medical services–did not offer inpatient behavioral health services for federal inmates.

ACH argues that the BOP, when it received final proposal revisions that contained conflicting information regarding the availability of behavioral health services at [. . .], should have sought to confirm whether those facilities could provide such services.  ACH further argues that the BOP should have accounted for the unavailability of behavioral health services at these facilities when evaluating whether the offerors proposed diverse services and in making its source selection determination.  ACH asserts that the BOP's failure to take these actions rendered the BOP's evaluation of the proposals arbitrary and capricious.

In support of its contentions, ACH relies on the GAO's decision in Continental Maritime of San Diego, Inc., B-249858 et al., 1993 WL 86794 (Comp. Gen. Feb. 11, 1993).  In that case, the procuring agency indicated in the solicitation that it would evaluate proposals under several factors and subfactors, including a Management Capability factor and that factor's Cost Reporting and Cost Avoidance subfactor.  Id. at *1.  During its investigation of whether the presumptive awardee was a responsible offeror, the procuring agency was advised by the Defense Contract Audit Agency ("DCAA") that the presumptive awardee did not have an accounting system acceptable for government contracting purposes and was not in compliance with regulatory requirements related to its material management and accounting system.  Id. at *2.  Nevertheless, the procuring agency awarded the contract to the presumptive awardee.  Id.

The unsuccessful offeror protested the contract award, arguing that the procuring agency should have considered the adverse information obtained during its responsibility investigation when evaluating the technical merit of the awardee's proposal. Id. The GAO agreed. Id. It noted that under the Cost Reporting and Cost Avoidance subfactor of the Management Capability factor, offerors were to use actual examples from their existing cost reporting systems to describe their systems for compiling internal and subcontractor costs. Id. at *3. It further noted that the awardee stated in its proposal that its existing cost reporting system was capable of fulfilling the requirements under this subfactor, but that the DCAA found otherwise. Id. The GAO observed:

> [G]enerally an agency's consideration of the technical merit or acceptability of an offeror's proposal is distinct from the consideration of the firm's responsibility. Technical merit or acceptability concerns an assessment of whether the offeror's approach and resources as described in its proposal are worthy of a particular rating or adequate to meet the needs of the agency as expressed in the [solicitation]. In contrast, responsibility involves an assessment of an offeror's ability to perform in accordance with the terms of its proposal and involves the evaluation of information outside the proposal collected during an investigation which is conducted aside from the actual competition and which may include the use of a preaward survey.
>
> It is not always possible to draw a distinct line between the two concepts because often traditional responsibility matters are incorporated into technical evaluation criteria used in negotiated procurements, and where an agency uses traditional responsibility criteria to assess technical merit or acceptability, the technical evaluation may involve consideration of an offeror's capability as well as its proposed approach and resources. In such cases, the agency may consider relevant information it obtains from outside the proposal for determining responsibility in order to reassess the technical merits of an offeror's proposal. In some circumstances, such information may not be ignored if received before award. For example, where the information clearly contradicts representations in the offeror's proposal, calling into question the evaluators' conclusions concerning the merits of the technical proposal, the information must be considered.

Id. at *4 (citations omitted); accord id. ("In evaluating proposals, the contracting agency may consider evidence from sources outside the proposal, and, in some circumstances, the contracting officer may not ignore extrinsic evidence that comes to his or her attention. For a procuring agency to ignore extrinsic evidence indicating that an offeror cannot perform in the way it offered would be unfair to the agency and to other competitors and thus inconsistent with the competitive procurement system." (citation omitted)). Applying these principles to the protest before it, the GAO held that "where information in the DCAA report contradicted proposal representations that were major elements of the technical evaluation, the [procuring agency] could not ignore the new information in its selection decision." Id. at *5.

Defendant and NaphCare argue that <u>Continental Maritime</u> does not apply to the facts of this bid protest.  Specifically, they contend that <u>Continental Maritime</u> only stands for the proposition that when evaluating the technical merits of an offeror's proposal, a procuring agency should consider extrinsic evidence if it is required, pursuant to the solicitation, to assess the offeror's ability to perform under the contract.  They further contend that this proposition is consistent with the rule that procuring agencies must evaluate proposals "based solely on the factors specified in the solicitation," 41 U.S.C. § 3701(a); <u>accord</u> FAR 15.305(a), and with binding precedent from the United States Court of Appeals for the Federal Circuit ("Federal Circuit").  For example, in <u>Allied Technology Group, Inc. v. United States</u>, the Federal Circuit held:

> Where an offeror has certified that it meets the technical requirements of a [solicitation], the Contracting Officer is entitled to rely on such certification in determining whether to accept a [proposal], and the offeror's potential failure to comply with the proposal requirements is ordinarily "a matter of contract administration," which does not go to the propriety of accepting the bid.  "However, where a proposal, <u>on its face</u>, should lead an agency to the conclusion that an offeror could not and would not comply with the [applicable requirement], we have considered this to be a matter of the proposal's technical acceptability," which <u>does</u> affect the propriety of accepting the offer.

649 F.3d 1320, 1330 (Fed. Cir. 2011) (citation omitted) (quoting <u>Centech Grp., Inc.</u>, 554 F.3d at 1039); <u>accord</u> <u>Per Aarsleff A/S v. United States</u>, 829 F.3d 1303, 1315 (Fed. Cir. 2016) ("[T]he general rule [is] that an agency may rely upon an offeror's certification of compliance with a solicitation's technical requirements."); <u>see also id.</u> at 1315 (observing that two statements in the solicitation regarding the requirement to maximize the use of Danish subcontractors referred to "contract performance, not eligibility criteria"; that in their proposals, all of the offerors agreed to comply with these requirements during contract performance; and that in the absence of any contrary evidence in each offeror's respective proposal, the procuring agency "did not act arbitrarily in declining to evaluate, as a condition of eligibility, whether each [offeror] would during performance comply with" the requirements).  Under the solicitation, defendant and NaphCare assert, the BOP's evaluation of the diversity of services proposed by the offerors was limited to determining whether the offerors proposed diverse services, and did not extend to determining whether the offerors could actually supply the services they proposed.  Thus, they argue, the BOP was not required to consider extrinsic evidence pertaining to the availability of the proposed services.  Defendant further contends that its position is supported by the solicitation's incorporation of FAR 52.212-4, which places the risk of not being able to provide the services offered in the proposal on the contract awardee.  According to defendant, this clause renders irrelevant any inability of NaphCare to supply, as it offered in its proposal, behavioral health services at [. . .].

Defendant's and NaphCare's arguments are unavailing.  As an initial matter, notwithstanding the fact that the Performance Work Statement described the "necessary services

. . . in terms of output rather than specific task assignments," AR 23, offerors were required to indicate, on the Technical Proposal Summary Sheets, what services each of their proposed hospital networks offered and whether the offerors were excluding from their proposals any of the services offered by the hospital networks.  By identifying the services they were excluding from their proposals, the offerors were affirmatively representing that all of the nonexcluded services offered by the hospital networks would be available to USP Atlanta.  Consequently, whether a hospital network would actually supply a particular service–such as behavioral health services–for USP Atlanta's inmates was material to the BOP's evaluation of whether the offerors proposed diverse services.

When the BOP received the offerors' final proposal revisions, it became aware that [. . .] might not be able to provide behavioral health services to USP Atlanta's inmates.  However, NaphCare did not exclude behavioral health services from these facilities in its proposal.  In light of the information in its possession, the BOP should have reopened discussions to ascertain whether, as NaphCare represented, [. . .] would provide behavioral health services to USP Atlanta's inmates.  The BOP's failure to do so rendered its comparative evaluation of the final proposal revisions–in which, based solely on the difference in behavioral health services offered by ACH and NaphCare, it both penalized ACH for failing to offer services as diverse as those offered by NaphCare and rewarded NaphCare for offering services more diverse than those offered by ACH–unreasonable.

The Federal Circuit precedent relied on by defendant and NaphCare in support of their contentions is factually distinguishable from this case.  Both Allied Technology Group and Per Aarsleff concerned situations in which an offeror's proposal (1) included a representation that the proposal met the solicitation's technical requirements and (2) contained other statements that allegedly rebutted the representation of technical compliance.  See Per Aarsleff, 829 F.3d at 1314-15 (indicating that the offeror represented that it would comply with all of the requirements set forth in the Performance Work Statement, which included the requirement to maximize the use of Danish subcontractors, but also stated that its American teaming partner would perform all of the requirements of the Performance Work Statement); Allied Tech. Grp., 649 F.3d at 1324 (indicating that the offeror certified its compliance with Section 508 of the Rehabilitation Act but also provided that it was "generally compliant with exceptions to the relevant Section 508 requirements").  In both cases, the issue was whether it was permissible for the procuring agency to accept an offeror's representation of technical compliance notwithstanding other information contained in the offeror's technical proposal.  Per Aarsleff, 829 F.3d at 1314-16; Allied Tech. Grp., 649 F.3d at 1330-32.

In contrast, the issue in this bid protest is not whether NaphCare could comply with the requirements set forth in the solicitation–the solicitation did not specify any services that offerors were required to propose.  Rather, this bid protest concerns the accuracy of the offerors' conflicting representations that certain services described in their proposals were available to federal inmates.  Given the offerors' conflicting representations, the BOP could not accurately assess or compare the diversity of services offered by ACH and NaphCare without ascertaining

whether ACH correctly excluded behavioral health services at [. . .] from its proposal and whether NaphCare could actually provide the behavioral health services it offered in its proposal. Thus, it was arbitrary and capricious for the BOP to penalize ACH for declining to offer services, while simultaneously rewarding NaphCare for offering those same services, without determining whether those services are available at all.[10]  See also AAA Eng'g & Drafting, Inc., B-250323, 1993 WL 116107, *4 (Comp. Gen. Jan. 26, 1993) ("[A]n agency may consider information bearing on a proposal that comes to light after the submission of proposals.  To require an agency to ignore information . . . which suggests that an offeror may not perform or intends to perform in a manner different from that reflected in a technically acceptable offer, would be unfair to both the agency and other competitors, and thus inconsistent with the competitive procurement system." (citations omitted)).

Furthermore, the BOP's failure to resolve the conflict between ACH's and NaphCare's proposals prejudiced ACH.  In its Source Selection Decision, the BOP concluded that NaphCare's proposal represented the best value because even though it proposed "slightly" higher prices than ACH, it offered more diverse services and better enhancements than ACH.  If, as ACH asserts, ACH and NaphCare actually offered similarly diverse services, then the BOP's tradeoff would be between the enhancements offered by NaphCare versus the "slightly" lower prices offered by ACH–in a competition where price was approximately twice as important as the technical factors as a whole, and approximately eight times as important as each technical subfactor individually.  See AR 64 (explaining the relative importance of the evaluation factors); infra Section II.D.3 (same).  Given that the BOP's tradeoff analysis might have been significantly affected by the offerors proposing similarly diverse services, there was a reasonable likelihood that ACH would have been awarded the contract had the BOP addressed the conflict between ACH's and NaphCare's proposals and resolved that conflict in ACH's favor.

---

[10]  It appears that the only way that ACH could have avoided being penalized for failing to offer services as diverse as those offered by NaphCare was to indicate on its Technical Proposal Summary Sheets for [. . .] that those facilities offered behavioral health services and that it was not excluding those services from its proposal.  Of course, if ACH made such representations while believing them to be false, it would have been lying to the BOP in its proposal.  And, if ACH was awarded the contract and those representations were later revealed to be false, ACH could face serious consequences, such as a default termination, a negative performance evaluation, or debarment.  Thus, although defendant contends that the BOP was protected by requiring the contract awardee to reimburse the BOP if it could not provide an offered service, an offeror, like ACH, is left unprotected if it represents that it can provide a service and then, upon being awarded the contract, is unable to deliver.  That an offeror could be placed in a situation where it can only succeed by misleading the procuring agency is antithetical to a fair and ethical procurement process.  See FAR 1.102(b)(3) (requiring procurements to be conducted "with integrity, fairness, and openness"); FAR 1.102-2(c)(3) ("All contractors and prospective contractors shall be treated fairly . . . .").

**2. Consideration of Information Regarding the Need for Behavioral Health Services**

ACH's other argument concerning behavioral health services–that the BOP failed to consider important information regarding USP Atlanta's need for behavioral health services– lacks merit. According to ACH, the BOP should have considered the fact that for the last six years, USP Atlanta has never requested outpatient facility behavioral health services for an inmate, as well as the fact that the availability of outpatient facility behavioral health services was irrelevant to the extent that such services are offered at the institution, given that USP Atlanta's preference is to treat inmates at the institution. Defendant and NaphCare counter that the BOP was entitled to declare in the solicitation the services it wanted a contractor to provide, even if it had not used such services in the past.

Defendant and NaphCare are correct. Procuring agencies are entitled to determine what services they want to acquire without regard to either the services they utilized in the past or the opinion of an offeror regarding the agency's needs. See Savantage Fin. Servs., Inc. v. United States, 595 F.3d 1282, 1286 (Fed. Cir. 2010); CHE Consulting, Inc. v. United States, 552 F.3d 1351, 1354 (Fed. Cir. 2008); Savantage Fin. Servs., Inc. v. United States, 86 Fed. Cl. 700, 706 (2009), aff'd, 595 F.3d at 1282. Thus, that USP Atlanta has not requested outpatient facility behavioral health services over the past six years and would be able to arrange for its inmates to receive behavioral health services within its confines do not preclude the BOP from seeking to acquire outpatient facility behavioral health services under the present solicitation or considering whether the offerors included such services in their proposals during its evaluation.

**C. The BOP's Discussions With ACH**

ACH next argues that the BOP failed to conduct meaningful and equitable discussions with respect to ACH's proposed long-term care facilities and the offerors' proposed prices. Guidelines for conducting discussions are set forth in the FAR. According to the FAR, discussions "are undertaken with the intent of allowing the offeror to revise its proposal," FAR 15.306(d), with the "primary objective of . . . maximiz[ing] the Government's ability to obtain best value," FAR 15.306(d)(2). "At a minimum," the procuring agency must

> indicate to, or discuss with, each offeror still being considered for award, deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond. The contracting officer also is encouraged to discuss other aspects of the offeror's proposal that could, in the opinion of the contracting officer, be altered or explained to enhance materially the proposal's potential for award. However, the contracting officer is not required to discuss every area where the proposal could be improved.

FAR 15.306(d)(3).

Procuring agencies may not favor "one offeror over another" when conducting discussions. FAR 15.306(e)(1). Consequently, although procuring agencies should tailor discussions to each offeror's proposal, FAR 15.306(d)(1), and are not required to conduct identical discussions with each offeror, WorldTravelService v. United States, 49 Fed. Cl. 431, 440 (2001), they should not "inform some offerors of a concern . . . while staying silent with respect to identical issues in other offerors' proposals," Ashbritt, Inc. v. United States, 87 Fed. Cl. 344, 372 (2009).

Further, for discussions to be meaningful, they must "generally lead offerors into the areas of their proposals requiring amplification or correction, which means that discussions should be as specific as practical considerations permit . . . ." SRS Techs., B-254425 et al., 1994 WL 576118, at *3 (Comp. Gen. Sept. 14, 1994), quoted in Advanced Data Concepts, Inc. v. United States, 43 Fed. Cl. 410, 422 (1999), aff'd, 216 F.3d at 1054. However, the procuring agency "need not discuss every aspect of the proposal that receives less than the maximum score or identify relative weaknesses in a proposal that is technically acceptable but presents a less desirable approach than others." Dev. Alts., Inc., B-279920, 1998 WL 546017, *5 (Comp. Gen. Aug. 6, 1998), quoted in ACRA, Inc. v. United States, 44 Fed. Cl. 288, 295 (1999). Ultimately, the scope of discussions is left to the procuring agency's discretion. See FAR 15.306(d)(3); Banknote, 56 Fed. Cl. at 384.

## 1. Discussions Related to ACH's Proposed Long-Term Care Facilities

ACH first contends that the BOP should have conducted discussions regarding its offering of services at long-term care facilities to render those discussions meaningful and equal. Specifically, ACH observes that the BOP identified the long-term care facilities offered by ACH [. . .] when it evaluated ACH's technical proposal, but then failed to ask ACH to explain its pricing of the services at those facilities before concluding in the Source Selection Decision that the lack of pricing information precluded it from determining the value of the facilities. According to ACH, this failure deprived the discussions of meaning. ACH further argues that discussions were unequal because the BOP did not raise any issues regarding its proposed long-term care facilities, while at the same time discussing with NaphCare three pricing weaknesses and NaphCare's proposed [. . .].

As noted by defendant and NaphCare, the BOP was not required to discuss the pricing of services at ACH's proposed long-term care facilities with ACH, as it was not identified as a significant weakness or deficiency of ACH's proposal. Rather, whether to conduct such discussions was within the BOP's discretion. In exercising that discretion, the BOP was not required to raise an issue if the proposal was otherwise technically acceptable, and ACH's offer to provide the services of long-term care facilities had no effect on the technical acceptability of its proposal because the BOP had not sought to procure long-term care in the solicitation.

Moreover, the BOP's discussions with NaphCare regarding three pricing weaknesses and the proposed [. . .] did not obligate the BOP to discuss ACH's proposed long-term care facilities

with ACH.  If, during discussions, a procuring agency raises an issue with one offeror, and the identical issue is implicated by another offeror's proposal, it must also raise that issue with the second offeror.  However, the pricing weaknesses identified by the BOP in NaphCare's proposal pertained to NaphCare offering prices for services described in the solicitation that the BOP deemed to be too high; in contrast, ACH did not address the pricing for its proposed long-term care facilities in its proposal at all, and long-term care was not described in the solicitation as a service that the BOP was seeking to acquire.  Similarly, NaphCare offered [. . .] to provide services described in the solicitation, while ACH offered long-term care facilities to provide services beyond what was described in the solicitation.

In sum, with respect to ACH's proposed long-term care facilities, discussions were neither lacking in meaning nor unequal.

## 2. Discussions Related to Pricing

ACH also contends that the BOP's price-related discussions were unequal because although the BOP advised NaphCare that it considered NaphCare's proposed prices in three categories to be weaknesses, it did not advise ACH that ACH should lower any of its proposed prices.  Defendant and NaphCare respond that the there was no need for the BOP to address ACH's pricing during discussions because ACH offered the lowest overall price.  Defendant further asserts that the BOP properly focused its attention on the three pricing categories in which NaphCare offered noticeably higher prices than ACH.[11]  Finally, defendant argues that the BOP provided ACH with the opportunity to lower its proposed prices when it invited the offerors to amend their proposals in any way they deemed necessary in their final proposal revisions.

---

[11]  ACH rejects defendant's intimation that the BOP's price-related discussion topics were based solely on the BOP's comparison of ACH's and NaphCare's proposed prices.  Rather, ACH asserts that the price-related weaknesses that the BOP raised with NaphCare during discussions were based on the price evaluation that the BOP performed before it established the competitive range–in which it evaluated all of the offerors' proposed prices–and therefore the BOP's identification of NaphCare's pricing weaknesses was not based solely on a comparison of the prices offered by ACH and NaphCare.  Consequently, ACH suggests that the BOP should have identified during discussions the instances in which ACH's proposed prices were higher than those proposed by any of the offerors, not just NaphCare.  The court rejects ACH's suggestion. The BOP's price evaluation document–dated February 28, 2017–includes a table comparing the prices proposed by each offeror in each category.  AR 483-84.  The BOP established the competitive range on that same date, id. at 498-99, and did not initiate discussions with ACH and NaphCare until March 6, 2017, id. at 501-04.  It is entirely reasonable to infer that the BOP considered only the prices proposed by ACH and NaphCare when formulating its discussion questions.  In fact, it would have made no sense for the BOP to advise ACH that one of its proposed prices was higher than a price proposed by an offeror whose proposal had been excluded from the competition.

As defendant and NaphCare note, when the BOP evaluated the offerors' initial business proposals, it found ACH's total proposed price to be lower than NaphCare's total proposed price. It therefore was reasonable for the BOP to raise pricing issues with NaphCare, but not ACH, during discussions. Moreover, it was within the BOP's discretion to determine that ACH's proposed [. . .]. In short, because the discussion topics were tailored to the offerors' proposals, price-related discussions were not unequal.

## D. The BOP's Source Selection Decision

Finally, ACH challenges the reasonableness of the BOP's Source Selection Decision on three grounds. The court addresses each ground in turn.

### 1. The BOP's Price Scoring Methodology

First, ACH asserts that the price scoring methodology described in the solicitation and used by the BOP to determine which offeror proposed the lowest price was inadequate for performing a best value tradeoff analysis because the methodology did not allow the BOP to ascertain the magnitude of the differences in the proposed prices. In support of its argument, ACH analogizes the total pricing scores calculated by the BOP to adjectival ratings, which are to be used by procuring agencies only as guides in evaluating proposals on nonprice criteria.

The methodology that the BOP planned to use to assess the offerors' proposed prices was clearly set forth in the solicitation. Although it is true that the BOP did not indicate that it would use the total pricing scores it calculated under that methodology in its best value tradeoff analysis, that omission was apparent on the face of the solicitation. In other words, the purported defect was patent. See Per Aarsleff, 829 F.3d at 1312 ("A defect is patent if it is 'an obvious omission, inconsistency or discrepancy of significance.'" (quoting E.L. Hamm & Assocs., Inc. v. England, 379 F.3d 1334, 1339 (Fed. Cir. 2004)). Consequently, as argued by defendant and NaphCare, ACH should have raised its concern regarding what price information the BOP intended to use to perform its tradeoff analysis before the due date for submitting proposals. See Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1312-16 (Fed. Cir. 2007) (holding that a protestor waives a challenge to the terms of a solicitation unless it raises the challenge prior to the deadline for the submission of proposals). Because it failed to do so, ACH waived its ability to raise its objection in this court. See id.; accord DGR Assocs., Inc. v. United States, 690 F.3d 1335, 1343 (Fed. Cir. 2012) ("[I]f there is a patent, i.e., clear, error in a solicitation known to the bidder, the bidder cannot lie in the weeds hoping to get the contract, and then if it does not, blindside the agency about the error in a court suit.").

### 2. The BOP's Evaluation of NaphCare's Proposed Prices

ACH's second challenge to the Source Selection Decision concerns the BOP's evaluation of the prices proposed by NaphCare in its final proposal revision. Specifically, it contends that the BOP failed to notice, or purposely disregarded, the fact that after it advised NaphCare during

discussions that it considered NaphCare's proposed prices for three of the pricing categories to be weaknesses, NaphCare actually increased its proposed price in one of the identified categories, did not change its proposed price for another of the identified categories, and raised its proposed price for a fourth category–the category that was most heavily weighted in determining the offeror with the lowest proposed price overall.  ACH further contends that when the BOP analyzed whether NaphCare's proposed prices were fair and reasonable, it improperly compared NaphCare's proposed prices to the prices proposed by the offerors whose proposals were eliminated from the competitive range.

The court agrees with defendant and NaphCare that neither of ACH's arguments has merit.  With respect to ACH's first contention, the BOP evaluated the prices proposed by NaphCare in its final proposal revision in accordance with the procedures for evaluating prices described in the solicitation.  It makes no difference that those proposed prices were higher than, lower than, or equal to the prices set forth in NaphCare's initial proposal.  With respect to ACH's second contention, the BOP evaluated whether NaphCare's proposed prices were fair and reasonable using the mechanism required by the FAR:  a price analysis.  See FAR 15.404-1(a)(2) (directing procuring agencies to perform a price analysis to determine the fairness and reasonableness of proposed prices if offerors are not required to submit certified cost or pricing data).  One of the preferred techniques for performing a price analysis is to compare "proposed prices received in response to the solicitation."  FAR 15.404-1(b)(2)(i); see also FAR 15.305(a)(1) (providing that a procuring agency's "comparison of the proposed prices will usually satisfy the requirement to perform a price analysis").  The FAR does not prohibit including in that comparison the prices proposed by offerors whose proposals were not included in the competitive range.  Indeed, ACH does not cite any legal authority for its contention that such prices could not be considered in a price analysis.

### 3. The BOP's Best Value Tradeoff Analysis

ACH's final challenge to the Source Selection Decision is that the BOP's best value tradeoff analysis was flawed because it was based on an improper evaluation of the offerors' technical proposals (namely, the diversity of the offerors' proposed services), and because the BOP deviated from the evaluation scheme set forth in the solicitation by not giving price the appropriate weight.  Defendant and NaphCare respond that the BOP has broad discretion in determining which proposal offers it the best value, and properly exercised that discretion.

According to the FAR, the competitive acquisition process is "designed to foster an impartial and comprehensive evaluation of offerors' proposals, leading to selection of the proposal representing the best value to the Government . . . ."  FAR 15.002(b).  "'Best value' means the expected outcome of an acquisition that, in the Government's estimation, provides the greatest overall benefit in response to the requirement."  FAR 2.101.  A best value "tradeoff process is appropriate when it may be in the best interest of the Government to consider award to other than the lowest priced offeror or other than the highest technically rated offeror."  FAR 15.101-1(a).

A procuring agency's award decision must "be based on a comparative assessment of proposals against all source selection criteria in the solicitation." FAR 15.308; accord FAR 15.304(a), (d). In documenting its award decision, the procuring agency must describe its "rationale for any business judgments and tradeoffs made or relied on . . . , including benefits associated with additional costs." FAR 15.308. Ultimately, procuring agencies "have substantial discretion to determine which proposal represents the best value for the government." E.W. Bliss, 77 F.3d at 449. Consequently, "where agency officials reasonably and properly exercise their discretion when conducting a best value analysis, the Court will not disturb an agency award." Blackwater Lodge & Training Ctr., Inc. v. United States, 86 Fed. Cl. 488, 514 (2009).

As an initial matter, the court has already concluded that the BOP's evaluation of the diversity of services proposed by the offerors was arbitrary and capricious and prejudiced ACH. Thus, ACH's challenge to the BOP's best value tradeoff analysis is sustained on that ground.

The court cannot, however, sustain ACH's other challenge to the BOP's best value tradeoff analysis–that the BOP did not accord price sufficient weight. In the solicitation, the BOP advised offerors that when conducting its tradeoff analysis, it would consider the evaluation factors and subfactors in accordance with the following rules:

- Price is approximately equal to the technical and past performance factors combined.

- The technical factor is equal to the past performance factor.

- The four technical subfactors are of equal importance.

Thus, price was approximately twice as important as the technical factors as a whole, and approximately eight times as important as each technical subfactor individually. According to ACH, in performing its tradeoff analysis, the BOP undervalued price and overvalued the technical factor. Specifically, it contends that because price was twice as important as the technical factor, and because its technical proposal was assigned only a slightly lower rating than NaphCare's technical proposal (Satisfactory versus Satisfactory(+)), its lower-priced proposal should have prevailed in the BOP's tradeoff analysis.

ACH's contention is appealing on its face–price was significantly more important than the technical factor, and the adjectival rating ACH received for its technical proposal was only slightly lower than the adjectival rating assigned to NaphCare's technical proposal. However, as ACH notes elsewhere in its motion for judgment on the administrative record, the BOP was entitled to look beyond the adjectival ratings to the contents of the proposals to determine whether meaningful differences existed between the proposals and, if so, the extent of the differences. Metcalf Constr. Co. v. United States, 53 Fed. Cl. 617, 640-41 (2002); see Hyperion, Inc. v. United States, 92 Fed. Cl. 114, 119 (2010) ("The adjectival ratings are merely a guide."). Although the adjectival ratings for the offerors' technical proposals were similar, the BOP

emphasized in its best value tradeoff analysis that NaphCare offered a greater diversity of services and better enhancements than ACH, and determined that these benefits outweighed NaphCare's slightly higher proposed price.[12]  The court cannot say that the BOP's determination, assuming that the BOP accurately assessed the diversity of services proposed by the offerors, reflects a misapplication of the solicitation's factor weighting scheme and is therefore unreasonable, especially in light of the substantial deference it must afford to the BOP's tradeoff analysis.[13]

### E.  ACH's Entitlement to Injunctive Relief

Because ACH has established the existence of a significant, prejudicial procurement error (the BOP's failure to address the conflict between the offerors' representations regarding whether [. . .] would provide behavioral health services to USP Atlanta's inmates), the court must address whether ACH is entitled to injunctive relief.  The United States Court of Federal Claims has the authority to award injunctive relief pursuant to 28 U.S.C. § 1491(b)(2), and is guided in making such an award by RCFC 65.  In determining whether to award a permanent injunction, the court must consider whether (1) the plaintiff has succeeded on the merits; (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) the balance of hardships favors the grant of injunctive relief; and (4) it is in the public interest to grant injunctive relief.  PGBA, LLC v. United States, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004).  The protestor bears the burden of establishing the factors by a preponderance of the evidence.  Lab. Corp. of Am. Holdings v. United States, 116 Fed. Cl. 643, 654 (2014); Textron, Inc. v. United States, 74 Fed. Cl. 277, 287 (2006).

ACH has succeeded on the merits with respect to one of its claims.  However, before the court can address the remaining injunctive relief factors, it must determine whether ACH waived its request for a permanent injunction.

---

[12]  ACH relies on the declaration prepared by Mr. Dixon that it submitted in support of its initial GAO protest to suggest that the difference between ACH's and NaphCare's total proposed prices is significant, not slight.  Specifically, Mr. Dixon employed USP Atlanta's actual usage of medical services under the incumbent contract to translate the offerors' proposed prices into dollar amounts, and determined that NaphCare's total proposed price was $1.1 million more than ACH's total proposed price.  While Mr. Dixon's calculations may be accurate, the court declines to consider arguments or evidence concerning how the offerors' proposed prices translate into dollar amounts because, pursuant to the solicitation, the BOP was not required to–and did not–evaluate the offerors' proposed prices in terms of dollar amounts.

[13]  Of course, the court has determined that the BOP may not have accurately assessed the diversity of services proposed by the offerors.  See supra Section II.B.1.  Consequently, if ACH and NaphCare actually offered similarly diverse services, then the BOP–applying the factor weighting scheme set forth in the solicitation–might reach a different conclusion in its best value tradeoff analysis.  See id.

## 1. Waiver of Request for Permanent Injunction

In its complaint, ACH requested, as part of its prayer for relief, a permanent injunction that "prohibited the [BOP] from procuring any work from the contract awarded to Naphcare under the Solicitation, until the [BOP] has held Discussions with ACH, re-evaluated proposals in accordance with the terms of the Solicitation, and made new best value determinations after such re-evaluation." Compl. Prayer for Relief ¶ 3. However, it did not address the irreparable injury, balance of hardships, and public interest factors it was required to establish to obtain a permanent injunction. Furthermore, in its motion for judgment on the administrative record, ACH did not reassert its request for a permanent injunction or address the injunctive relief factors. Defendant and NaphCare remarked upon this deficiency in their responses/cross-motions, and argued that ACH's failure to offer argument and evidence in support of an award of injunctive relief precluded ACH from establishing entitlement to such an award. Nevertheless, defendant and NaphCare addressed the injunctive relief factors (and defendant submitted a declaration from the SSA describing the harm that the BOP would suffer from an award of injunctive relief[14]) to argue that ACH was not entitled to a permanent injunction. In its reply/response, ACH conceded that it failed to address all of the injunctive relief factors and attempted to cure its oversight by presenting argument regarding each of the factors (but not any evidence in support its allegation of harm). Defendant and NaphCare, in their replies, argued that ACH had not cured its initial failure to address the injunctive relief factors, but even if it had, it failed to establish entitlement to a permanent injunction. Ultimately, after oral argument and at the court's direction, ACH filed a declaration in support of its request for a permanent injunction, and defendant and NaphCare filed responses to that declaration.

Normally, the failure to raise an argument in an opening brief constitutes the waiver of that argument. SmithKline Beecham Corp. v. Apotex Corp., 439 F.3d 1312, 1319 (Fed. Cir. 2006) ("[A]rguments not raised in the opening brief are waived."); Novosteel SA v. United States, 284 F.3d 1261, 1274 (Fed. Cir. 2002) ("Raising the issue for the first time in a reply brief does not suffice; reply briefs reply to arguments made in the response brief–they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration."). Courts, however, possess the "discretion to consider arguments that are not properly raised in the opening brief." SmithKline Beecham, 439 F.3d at 1320 n.9. In fact, this discretion has been exercised in circumstances similar to those presented in this bid protest. In Ironclad/EEI v. United States, the protestor did not address the factors for obtaining a permanent injunction in its motion for judgment on the administrative record, "but instead discussed them in its response brief only." 78 Fed. Cl. 351, 358 (2007). The court recognized that the application of the waiver rule was not mandatory, and found that "because defendants were able to fully

---

[14] In his declaration, the SSA invoked 28 U.S.C. § 1746, which allows for the submission of unsworn declarations made under the penalty of perjury. However, the SSA did not declare that his statements were true and correct "under penalty of perjury," as 28 U.S.C. § 1746 requires. Nevertheless, the court finds that this oversight does not detract from the weight of the declaration.

respond to [the protestor's] contentions regarding permanent injunctive relief in their reply briefs, the concept of waiver . . . [was] inapplicable." Id.

In this bid protest, ACH addressed the factors for obtaining a permanent injunction in its reply/response, and defendant and NaphCare had the opportunity to–and did in fact–respond to ACH's contentions in their replies.[15]  In addition, defendant and NaphCare preemptively addressed the factors in their responses/cross-motions, and responded to the declaration that ACH filed in support of its request for a permanent injunction.  Thus, neither defendant nor NaphCare would be prejudiced by the court considering ACH's request for a permanent injunction.  Accordingly, the court finds that ACH has not waived its request and therefore considers the remaining injunctive relief factors.

## 2.  Irreparable Injury

With respect to the irreparable injury factor, "[t]he relevant inquiry . . . is whether plaintiff has an adequate remedy in the absence of an injunction."  Magellan Corp. v. United States, 27 Fed. Cl. 446, 447 (1993); see also Younger v. Harris, 401 U.S. 37, 43-44 (1971) (noting that "the basic doctrine of equity jurisprudence [is] that courts of equity should not act . . . when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief").  ACH contends that it would be irreparably injured absent a permanent injunction because it would be deprived of a fair opportunity to compete for the contract.  ACH also argues that it would be irreparably injured absent a permanent injunction because it would lose the revenue it would receive had it been awarded the contract, and the revenue it receives from the incumbent contract amounts to a large percentage of its total revenue–46% of its total revenue in 2016 and 35% of its total revenue in 2017.  Defendant and NaphCare counter that the harms described by ACH are insufficient to establish an irreparable injury.

This court has recognized that a lost opportunity to compete for a contract–and the attendant inability to obtain the profits expected from the contract–can constitute irreparable injury.[16]  See, e.g., Akal Sec., Inc. v. United States, 87 Fed. Cl. 311, 319 (2009); Heritage of Am., LLC v. United States, 77 Fed. Cl. 66, 78 (2007); Overstreet Elec. Co. v. United States, 47 Fed. Cl. 728, 743 (2000); see also Serco Inc. v. United States, 81 Fed. Cl. 463, 501-02 (2008) (observing that when "the only other available relief–the potential for recovery of bid preparation costs–would not compensate [the protestors] for the loss of valuable business," such a "loss, deriving from a lost opportunity to compete on a level playing field for a contract, has been found sufficient to prove irreparable harm").  Because ACH would lose the fair opportunity to compete

---

[15]  Defendant and NaphCare also had the opportunity to address ACH's request for a permanent injunction during oral argument, but chose not to do so.

[16]  The court recognizes that lost profits are distinct from lost revenue.  However, if lost profits can constitute an irreparable injury, then the loss of the revenue that generates those profits can also constitute an irreparable injury.

for the contract and a significant percentage of its annual revenue absent a permanent injunction, the court finds that ACH has established an irreparable injury.

### 3. Balance of Harms

In addition to considering whether a protestor would suffer an irreparable injury absent a permanent injunction, "the court must weigh the irreparable harm plaintiff would suffer without an injunction against the harm an injunction would inflict on defendant and defendant-intervenor." Progressive Indus., Inc. v. United States, 129 Fed. Cl. 457, 485 (2016).  On the one hand, ACH argues that the harm it would suffer absent a permanent injunction–the loss of a significant percentage of its total revenue–outweighs the harms that the BOP and NaphCare might incur if such an injunction issued because defendant has no right to award a contract, and NaphCare has no right to be awarded a contract, if the evaluation of proposals was arbitrary and capricious.  On the other hand, defendant contends that the balance of harms weighs in the BOP's favor because if a permanent injunction issues, the BOP (1) would not be able to avail itself of the enhancements offered by NaphCare in its proposal, and (2) would continue to lack any guarantee that medical services would be provided beyond the expiration of the short-term purchase orders currently being used to obtain the services from ACH, leading to potential safety and security issues.  Defendant submitted a declaration from the SSA in support of its allegations of the BOP's harms, and contends that ACH's declaration fails to address the contention raised in the SSA's declaration that the BOP would be harmed by ACH not offering behavioral health services at firm-fixed prices.  NaphCare, in turn, asserts that it would be harmed by a permanent injunction because it would be deprived of both its expected profits under the contract and the experience arising from a commercial relationship with the BOP.

In response to defendant's contention regarding the dangers of relying on short-term purchase orders to provide medical services to USP Atlanta, ACH avers that it has been providing comprehensive medical services to USP Atlanta for approximately six years (and on a month-to-month basis for the last year) without any problems, and represents that it would not abandon the work at USP Atlanta and forego a large percentage of its total revenue.  It also argues that defendant provided no evidence that the prices paid by the BOP under the short-term purchase orders are any higher than the prices that the BOP would pay to NaphCare under the new contract.  With respect to NaphCare's allegation of harm, ACH argues that NaphCare is better positioned to absorb the effects of a permanent injunction because NaphCare is a large business,[17] while ACH is a service-disabled, veteran-owned small business.

Because ACH represents that it would not cease providing medical services to USP Atlanta (voluntarily depriving itself of a large percentage of its total revenue) upon the issuance of a permanent injunction, and because NaphCare would not necessarily lose its expected profits

---

[17]  ACH's statement that NaphCare is a large business is based on its review of NaphCare's registration information in the federal government's System for Award Management database, which is available at http://www.sam.gov.

or experience if a permanent injunction issues (because it still may be awarded the contract), the harm that ACH would suffer–the loss of the fair opportunity to compete for the contract and a significant percentage of its revenue–absent a permanent injunction outweighs the harms alleged by the BOP and NaphCare.

### 4. Public Interest

Finally, when "employing the extraordinary remedy of injunction," a court "should pay particular regard for the public consequences" of doing so.  Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982).  There is no dispute that "the public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid." Overstreet Elec., 47 Fed. Cl. at 744; accord Bona Fide Conglomerate, Inc. v. United States, 96 Fed. Cl. 233, 242 (2010) (noting the "overriding public interest in preserving the integrity of the procurement process").  "However 'there is a countervailing public interest in minimizing disruption [to the agency].'" Akal Sec., 87 Fed. Cl. at 321 (quoting Heritage of Am., 77 Fed. Cl. at 78); accord Aero Corp., S.A. v. United States, 38 Fed. Cl. 237, 242 (1997) ("[A] procuring agency should be able to conduct procurements without excessive judicial infringement upon the agency's discretion.").

ACH argues that the issuance of a permanent injunction would serve the public interest because the BOP failed to comply with the applicable procurement law.  ACH further argues that there is a public interest in promoting the development of service-disabled, veteran-owned small businesses like itself.  Defendant, in turn, contends that a permanent injunction would be contrary to the public interest because the BOP would be deprived of the technical advantages described in NaphCare's proposal.  And, NaphCare asserts that there is a public interest in avoiding delays in the procurement process.

Because the BOP acted arbitrarily and capriciously in evaluating ACH's and NaphCare's technical proposals, the procurement process was compromised.  Thus, ACH has established that the public interest would be served by the issuance of a permanent injunction.

### 5. Conclusion

ACH has succeeded on the merits of one of its claims and has established, by a preponderance of the evidence, the remaining factors for awarding injunctive relief.  Accordingly, the court grants ACH's request for a permanent injunction.

### III. CONCLUSION

For the reasons set forth above, the court finds that injunctive relief is appropriate in this bid protest.  Therefore:

- ACH's motion for judgment on the administrative record is **GRANTED IN PART** and **DENIED IN PART**;

- Defendant's and NaphCare's cross-motions for judgment on the administrative record are **GRANTED IN PART** and **DENIED IN PART**;

- NaphCare's motion to strike portions of the administrative record is **DENIED AS MOOT**;[18] and

- The BOP is **ENJOINED** from commencing performance on its contract with NaphCare until it has reopened discussions to ascertain whether NaphCare could actually provide behavioral health services to USP Atlanta's inmates at [. . .];[19] reevaluated the proposals in light of the discussion responses; and made a new source selection determination, ensuring that each factor is accorded the appropriate weight.

The clerk is directed to enter judgment accordingly.

The court has filed this ruling under seal.  The parties shall confer to determine agreed-to proposed redactions.  Then, by **no later than Monday, April 16, 2018**, the parties shall file a joint status report indicating their agreement with the proposed redactions, **attaching a copy of those pages of the court's ruling containing proposed redactions, with all proposed redactions clearly indicated**.

Further, the court reminds the parties of their obligation under paragraph 12 of the protective order filed on January 18, 2018, to file redacted versions of protected documents for the public record.  If the parties have not already filed redacted versions of their motions and supporting briefs, they shall file a joint status report by **no later than Monday, April 30, 2018**, explaining the reason for the delay.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge

---

[18]  The court notes that it did not consider the documents that NaphCare sought to have removed from the administrative record in its analysis of ACH's claims.

[19]  The court suggests that the BOP request evidence from both ACH and NaphCare regarding the basis for their representations that they can/cannot supply behavioral health services at the facilities at issue.